John CORLEY and Adell Williams et al., Plaintiffs,

v.

CITY OF JACKSONVILLE et al., Defendants.

Olivette COFFEY, Jr. et al., Plaintiffs,

v.

Dwight BRADDY et al., Defendants.

Nos. 80–383–Civ–J–S, 71–44–Civ–J–S.

United States District Court,
M. D. Florida,
Jacksonville Division.

Jan. 23, 1981.

529

Deitra Micks, William J. Sheppard, Jacksonville, Fla., for plaintiffs.

Thomas E. Crowder, Jacksonville, Fla., for defendants.

OPINION

CHARLES R. SCOTT, Senior District Judge.

The above-styled consolidated cases came on for hearing on January 6, 1981. Two matters were before the Court: (1) motion of plaintiffs in *Corley v. City of Jacksonville*, No. 80–383–Civ–J–S, for a preliminary injunction; and (2) an order to show cause entered in response to the filing of a notice of violation by the plaintiffs in *Coffey v. Braddy*, No. 71–44–Civ–J–S.

*Findings of Fact*

*Coffey v. Braddy —*

*Coffey v. Braddy* was a civil rights action brought by black applicants to the Jacksonville Fire Department who had failed the written examination administered by the Civil Service Board, which failure barred them from taking any further steps to become fire fighters.[1] The plaintiffs alleged that they failed the test solely because it was racially discriminatory in that it was not reasonably related to the skills and duties necessary to perform the job of Fire Private. To support this contention, plaintiffs argued that the test had never been "professionally constructed, evaluated or approved", i. e., the test had never been validated. As a result of the alleged discriminatory nature of the test, only two out of 700 employees in the Jacksonville Fire Department were black at the time the suit was filed, January 26, 1971. Although the suit was filed as a class action and the Court has always treated it as such, the class was not actually certified until January 6, 1981.[2]

A consent order was entered August 12, 1971, implementing a plan designed to correct past adverse racial impact caused by the unvalidated examination and to develop a suitable battery of tests based upon new evaluations of job criteria essential to successful performance in the role of Fire Private. As a long-range objective, the tests were to be validated as to logical or content validity. Additionally, the order required

defendants to intensify recruitment efforts in order to attract qualified and interested black fire fighter applicants.

The order established a specific hiring formula calculated to achieve a ratio of black firemen to white firemen equal to the ratio of black citizens to white citizens in the City of Jacksonville. Specifically, the Court ordered:

That defendants will, effective July 1, 1971, take whatever action is necessary to hire fifty percent (50%) black and fifty percent (50%) white individuals to fill funded positions of Fire Private from the appropriate eligible list until the ratio in the Fire Department of black firemen to white firemen equals the ratio of black citizens to white citizens in the City of Jacksonville, and that such ratio shall be applicable to each such eligible list until no black candidates or white candidates remain thereon. Appointments from such eligible lists shall be governed by the "rule of three" [subsequently amended on September 29, 1971 to "rule of five"] provided in current Civil Service rules consistent with the ratio set forth in the preceding sentence, provided, however, parties to this cause may at any time for good cause move the Court to modify the hiring procedures herein.

On June 2, 1980, the plaintiffs filed a notice of violation alleging that the defendants have failed to comply with the hiring formula set forth above. As evidence of this violation, they offered statistics obtain-

---

1. Also named as a plaintiff was a resident of "East Jacksonville," a predominantly black residential area, who alleged that under certain circumstances, such as civil insurrection or natural disaster, an all-white Fire Department could not safely afford fire protection to residents of her community.

2. By order entered that date, the Court certified the class in *Coffey v. Braddy*, as well as the class in *Corley v. City of Jacksonville*, as consisting of:

   (3) the plaintiff class in the above-styled, consolidated cases is defined as all black residents of the Consolidated City of Jacksonville, Duval County, Florida, and of those black residents elsewhere who may utilize the services of the Jacksonville Fire Depart-

ment who have been discriminated against because of race.

(4) three subclasses of the plaintiff class in the above-styled, consolidated cases are:

(a) all past, present, and future black employment applicants with the Fire Department of the City of Jacksonville, Florida,

(b) all past, present, and future black employees with the Fire Department of the City of Jacksonville, Duval County, Florida, and

(c) all past, present, and future black employment applicants and employees of the Public Service Employment Program or other training programs contracted with defendant City and the U. S. Department of Labor or other governmental authority wherein the services of these employees are utilized by the Jacksonville Fire Department.

ed from Fire Chief Russell Yarbrough pursuant to a subpoena duces tecum showing that only 66 of the 251 Fire Privates hired from the entry of this Court's August 12, 1971 order (as modified by stipulation on September 29, 1971) through May 14, 1980, were black. Since the number of blacks hired following entry of the Court's order constitutes only 26% of the total number hired, rather than 50%, and since the ratio of black firemen to white firemen is not yet equal to the ratio of black citizens to white citizens in the City of Jacksonville, the plaintiffs argue the order has been violated.

On the basis of this notice of violation, the Court entered an order to show cause on June 9, 1980. Defendants' response, filed June 30, 1980, denied any violation of the Court order. They call attention to the language of paragraph 7 of the 1971 order, which commands the defendants to "... take whatever action is necessary to hire fifty percent (50%) black and fifty percent (50%) white individuals to fill funded positions of Fire Private *from the appropriate eligible list ....*" and "that such ratio shall be applicable to each such eligible list *until no black candidates or white candidates remain thereon.*" (Emphasis added). Defendants maintain, and plaintiffs apparently do not disagree, that they have hired 50% black and 50% white individuals from the eligible list until no black candidates remained thereon. At that point, the remaining positions have been filled by white candidates taken from the eligible list.

In other words, defendants have been in technical compliance with the 1971 order. Thus, the only issue to be decided is whether defendants' methods of developing their "eligible list" are valid in light of the statutory and constitutional standards which prohibit an employer from discriminating in its hiring practices on the basis of race.

At the January 6, 1981, hearing, counsel for plaintiffs directed his arguments toward the 1979 Fire Fighter Selection Examination administered January 8–11, 1979. Of the 607 applicants taking the test, 338 received a passing score of 70 or above. On May 31, 1979, offers were extended to 105 individuals, including all blacks on the eligible list, i. e., those who had received a passing score. Seventy persons were hired, 47 whites and 23 blacks.

Plaintiffs contend that an equal number of blacks and whites should have been hired in accordance with the formula contained in paragraph 7 of the 1971 consent order, that is, 35 whites and 35 blacks. Defendants, on the other hand, argue that they are in full compliance with the order, in that they have made offers to every black on the eligible list and only after that list was depleted of blacks did they resort to hiring eligible whites only.

The entire thrust of plaintiffs' argument is devoted to the racially-discriminatory *impact* of the 1979 Fire Fighters Selection Examination. The plaintiffs do not contend that the exam itself is invalid, but rather that the *application* of it is. Specifically, plaintiffs direct the Court's attention to a report entitled "The Development of a Fire Fighter Selection Examination for the City of Jacksonville" prepared by a former city employee, H. Gene Roy. They zero in on the conclusion contained in the report that:

> The results of the written examination reveal a statistically significant adverse impact against black examinees when compared to white examinees with a cut-off score of 42% percent or greater.

In other words, in order to eliminate any adverse racial impact, the passing score on the test of 100 questions would have to be lowered from 70 to 41. This would mean that 560 out of the total of 607 applicants who took the 1979 exam would have passed.

Of critical significance is the fact that plaintiffs do not contend that the test itself is invalid. It would be difficult for them to do so in light of the fact that the very report on which they rely so heavily to show adverse racial impact also demonstrates the content validity of the 1979 exam. The report states that the exam was developed using a content validity strategy in accordance with the Uniform Guidelines On Employee Selection Procedures promulgated by

the Equal Employment Opportunity Commission (EEOC).[3]  29 C.F.R. § 1607.

As the first step towards developing the content valid examination, a committee of incumbent Fire Division personnel was appointed by the Fire Department Chief to serve as subject-matter-experts.[4]  The committee was composed of four fire fighters, two fire lieutenants, and one fire captain. One of the fire fighters and one lieutenant were black, the other five committee members were white.

The committee's first task was to define and refine all essential work behaviors performed by fire fighters.  An index of criticality (CI) was calculated for each behavior by considering the amount of time spent performing the behavior, the frequency of its occurrence and the importance of the work behavior in overall job performance. If the work behavior was one which is learned on the job or which is not performed on job entry, it was disregarded. The relative weight of each behavior in job performance was determined by employing the CI as a guide.  Four work behaviors were determined to have weight, i. e., they are performed by new recruits in learning to perform the job of fire fighter at the training academy:

   (1) studies manuals and procedures to become familiar with basic fire fighting procedures.  Weight—.40.

   (2) studies procedures and/or manuals to become familiar with tools and equipment.  Weight—.30.

   (3) studies manuals and procedures to become familiar with First Aid. Weight—.20.

   (4) studies manuals to become familiar with standard operating procedures. Weight—.10.

These work behaviors were then analyzed to determine their task components, i. e., the tasks essential to behavior performance. Each essential work behavior was determined to consist of one essential task, e. g., the task necessary to perform work behavior No. 1 above would be: "studies fire fighting manuals and procedures to become familiar with the use of these procedures at an emergency scene."

The next step in the validation process was to analyze each task to determine which knowledges, skills and abilities (KSA) are required for successful performance of the task.  Each KSA was operationally defined and assessed a relative weight based upon its importance in task performance.  Each KSA was refined until all committee members agreed that it was necessary to successful job performance.

Items for the 1979 exam were developed for those KSAs determined to be properly assessed by a written examination rather than a test of physical performance.  By totalling the final weights accorded to each KSA, it was determined that 64% of the total assessment should be based upon a written examination and 36% based upon a physical agility examination.  The final weight of each KSA was obtained by multiplying the KSA weight by the behavior weight.  A written examination weight was derived from dividing each final KSA weight by .64, the weight of the written examination.  The results reflected that 81% of the written examination should measure the examinee's ability to comprehend and use reading material at the 12th grade level, 14% should assess the examinee's knowledge of mathematics through proportions and percentages, and 5% should

---

**3.**  As noted in text, *supra*, the 1971 order required defendants to validate their fire fighter examination by utilizing either a "logical or content validity" method.  The Equal Employment Opportunity Commission guidelines endorse three types of validity studies: criterion-related validity studies, content validity studies, or construct validity studies.  29 C.F.R. § 1607.-5(A).

**4.**  All of the information relating to the development of a content valid examination is derived from the report entitled "The Development of a Fire Fighter Selection Examination for the City of Jacksonville" filed in the record March 16, 1979.  The Court's discussion of the validity study is intended as a summary only.  Reference should be made to the actual report for a complete understanding of the study.

assess the examinee's knowledge of elementary algebra.[5]

Once developed, each examination item was then rated by the committee on the following scale:

(1) unrelated—not closely related to any KSA necessary for successful job performance.

(2) fair—related to the level of _____ KSA necessary for successful job performance, but *not* likely to make significant distinctions between adequate and inadequate levels of competence.

(3) good—related to the level of _____ KSA necessary for successful job performance, and likely to make significant distinctions between adequate and inadequate levels of competence.

(4) superior—related to the level of _____ KSA necessary for successful job performance and likely to make significant distinctions between adequate and superior levels of competence.

Each question was assigned a rating of from 1.0 to 4.0, based upon the scale set forth above. All questions received an average rating of 2.5 or above. Those items receiving an average rating from 2.5 to 3.4 were considered to be measuring the minimum KSAs required. Since 74 of the 100 questions fell within this zone, a raw score of 74 was established as a passing grade.[6]

The post-examination statistical analysis disclosed that the examination, despite its content validity, has a significant adverse impact against black applicants and that such an adverse impact could be eliminated

only by lowering the cutoff score to 41. By utilizing a cutoff score of 70, the "eligible list" of successful examinees taking the 1979 test did not contain enough blacks to enable the City to hire 50% blacks and 50% whites to fill the 70 available positions.

The question of law before the Court is whether evidence of significant adverse racial impact is sufficient under the Constitution and laws of the United States to require the City of Jacksonville to abandon or substantially change its Fire Fighter Selection Examination or to lower the passing score on that examination so as to eliminate any adverse racial impact.

*Corley v. City of Jacksonville* —

The issues raised in this case are substantially the same as those raised in *Coffey v. Braddy.* The suit was filed as a class action [7] by two former Public Service Employment Program (PSEP) Fire Cadets who alleged that they were terminated, either actually or constructively, as a result of defendants' discriminatory hiring practices, in violation of the Thirteenth and Fourteenth Amendments to the United States Constitution, Title 7 of the Civil Rights Act of 1964, the Comprehensive Employment and Training Act of 1973 (CETA),[8] the Florida Constitution, Chapter 150 of the Municipal Ordinance Code of the City of Jacksonville, and Executive Orders of the Mayor of the City of Jacksonville.

Although various aspects of the Jacksonville Fire Division's hiring policies and practices are complained of,[9] the crux of the

---

**5.** After investigation revealed that the reading material employed in the prior fire fighter examination was no longer job-related, items from that examination were discarded.

**6.** The procedure utilized in setting the cutoff score was developed by the Great Lakes Assessment Council. International Personnel Management Association, *Content Validity: a Procedural Manual, Chicago, 1973.* The Civil Service Board set the cutoff score at 70. Although the examination consisted of 100 questions, the post-examination statistical analysis showed that two items did not discriminate properly, i. e., one was "too easy" and one was "too hard". Accordingly, pursuant to recommendation by H. Gene Roy, the author of the

validity report, the two questions were deleted and the tests regraded, with the final percentage score based upon 98 items.

**7.** See note 2, *supra.*

**8.** 29 U.S.C. § 801 *et seq.* Funding for PSEP was provided by the Department of Labor, through the CETA program.

**9.** The complaint also attacks the medical and physical fitness requirements imposed upon fire fighter applicants. It appears that these requirements are set by the State of Florida Bureau of Fire Standards and Training, the agency responsible for certifying fire fighters. Initially, plaintiff John Corley was denied certi-

complaint is that the cutoff score of 70 on the Fire Fighters Selection Examination has a discriminatory impact upon blacks. Both named plaintiffs took and failed the 1979 written examination, i. e., they received a score of less than 70.

The motion for preliminary injunction seeks to enjoin the defendants from terminating the named plaintiffs (they are presently employed in a provisional capacity) and also to enjoin defendants from further utilizing their present testing, selection, and hiring policies and practices on the basis that they result in a discriminatory impact against blacks, are not job related, and are otherwise contrary to law.

The question of law before the Court in this case is whether plaintiffs have satisfied the prerequisites to the issuance of a preliminary injunction, i. e., have shown: a significant threat of irreparable harm if the injunction is not granted, that such harm would outweigh any potential harm an injunction would inflict upon defendants, the probability that plaintiffs will succeed on the merits, and that the issuance of a preliminary injunction will not work any disservice to the public interest.

### Conclusions of Law
#### Coffey v. Braddy —

Discrimination is an abhorrent creature, that preys upon the dignity and sense of self-worth of every victimized individual. It is a changeling that assumes many forms, but none is more distasteful than racial discrimination, in light of its painful and

pervasive history in this country. Rightly or wrongly, much of the burden of establishing and enforcing policies and practices aimed at eliminating discrimination has fallen upon the federal courts. Substantial progress has been made, yet the battle is far from over. The truth of the matter is that bigotry and racism are likely never to disappear for we cannot control the hearts and minds of men and women. We can only hope to control the outward manifestations of discrimination. The courts must remain ever vigilant to ensure that this is done.

Nevertheless, not every action that results in a disparity or inequality between persons of a different race, sex, religion, etc., is motivated by an invidious purpose to discriminate. We cannot disregard all other principles of fairness and necessity for the sole reason that to apply them would result in a numerical inequality between persons otherwise equal under the law.

The instant case presents precisely such a situation. The City of Jacksonville is responsible for protecting the health and welfare of its citizens. The citizens expect, and the City is obligated to provide, safe and adequate fire protection. As part of the process to ensure that this is done, the City administers a written examination to all applicants for the position of Fire Private. The test has been validated in accordance with guidelines promulgated by the EEOC. The content of the test has been thoroughly analyzed in order to ensure that it tests only those knowledges, skills and abilities

fication due to scar tissue resulting from the removal of a duodenal ulcer. He sued the State Fire Marshal and the City of Jacksonville in the Fourth Circuit Court in and for Duval County, No. 78–13488–CA, and was subsequently certified. That suit was then voluntarily dismissed. Although the Court is not ruling on the merits of plaintiffs' case, it is required to determine the plaintiffs' likelihood of success on the merits on ruling the motion for preliminary injunction. As to the issue relating to improper medical and physical fitness requirements, it is difficult to see how plaintiffs could prevail on the merits when it is the State that establishes such requirements and applies them to each individual and no State defendants are named in this case.

As to physical "agility" requirements (it is unclear from the complaint or the motion for preliminary injunction whether these are also being attacked as invalid), these are no longer utilized during the selection process as the result of a validation study conducted by the Florida State Fire College which found them to be unrelated to job performance. The fire fighter examination validity study states that "[T]he City will not evaluate physical agility during the selection process but will instead require that fire fighter recruits be physically able to perform fire fighter duties before they graduate from the Jacksonville Fire Training Academy."

essential to successful performance of the job of Fire Fighter. The committee responsible for this validation was comprised of both blacks and whites, and the validation report states that, at each step of the study, definitions and requirements were refined until all members of the committee reached agreement.

■ The law on this issue, as it emanates from the highest court of our land, is clear. Examination requirements, even if they have a disparate impact upon persons of different race, are permissible if they have been professionally validated, i. e., they have been shown to be sufficiently related to accurately measuring the ability to perform the job in question.

In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the United States Supreme Court unanimously held that Title VII [10] forbids the use of employment tests that have an adverse racial impact unless the employer meets "the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question." *Id.* at 432, 91 S.Ct. at 854. The court employed strong language supporting the concept that job-related employment tests are permissible, despite their racial impact:

> Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality and sex become irrelevant. What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract. Id. at 436, 91 S.Ct. at 856.

*Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), involved a suit by black police officers attacking the hiring practices of the District of Columbia Metropolitan Police Department. Specifically, the plaintiffs argued that the employment tests administered to applicants were unconstitutional in that they deprived plaintiffs of due process under the Fifth Amendment to the United States Constitution. To support this, they offered evidence to show, and the district court so concluded, that the number of black police officers was disproportionate to the population mix of the city and that a higher percentage of blacks failed the test than whites. Despite these findings of fact, the Supreme Court adhered to the decision of the district court, upholding use of the tests. In doing so the Supreme Court noted that while disproportionate impact is not irrelevant, "it is not the sole touchstone of invidious racial discrimination forbidden by the Constitution." *Id.* at 242, 96 S.Ct. at 2048–2049. The court went on to state:

> ■t is untenable that the Constitution prevents the Government from seeking modestly to upgrade the communicative abilities of its employees rather than to be satisfied with some lower level of competence, particularly where the job requires special ability to communicate orally and in writing. Respondents, as Negroes, could no more successfully claim that the test denied them equal protection than could white applicants who also failed. The conclusion would not be different in the face of proof that more Negroes than whites had been disqualified by Test 21. *Id.* at 247, 96 S.Ct. at 2051.

■ The court elaborated upon the distinction between the Title VII standard for establishing employment discrimination and the constitutional standard under the Equal Protection Clause.[11] To establish a viola-

---

10. Although the complaint in *Coffey v. Braddy* rests primarily upon the Due Process and Equal Protection Clauses of the Fourteenth Amendment, guidance in resolving employment discrimination problems can be found in those cases raising Title VII claims. *Washington v. Davis*, 426 U.S. 229, 236 n. 6, 96 S.Ct. 2040, 2046 n. 6, 48 L.Ed.2d 597 (1976). Additionally, resolution of the issue before the Court in *Coffey v. Braddy* is more or less determinative of the issue in *Corley v. City of Jacksonville*, which does raise Title VII claims.

11. The plaintiffs relied upon 42 U.S.C. § 1981 in their complaint, alleging a violation of due process under the Fifth Amendment to the United States Constitution. Nevertheless, Title VII standards dominated the case even though Title VII was not applicable to federal employees when the complaint was filed. *Washington*

tion of the Equal Protection Clause the plaintiff must show a discriminatory *purpose*. A practice is not unconstitutional under the Equal Protection Clause if only a racially disproportionate impact is shown. To the contrary, to establish a violation of Title VII, a plaintiff is not required to show purposeful discrimination, but instead may focus solely on the racially differential impact of the challenged hiring practices. *Id.* at 238, 96 S.Ct. at 2046. When he does, he has established a prima facie case and the burden shifts to the employer. Under Title VII, it is not a sufficient response for an employer to show some "rational basis" for the challenged practice.

It is necessary, in addition that [the tests] be "validated" in terms of job performance in any one of several ways, perhaps by ascertaining the minimum skill, ability or potential necessary for the position at issue and determining whether the qualifying tests are appropriate for the selection of qualified applicants for the job in question. *Id.* at 247, 96 S.Ct. at 2051.

This is precisely the method employed by the City of Jacksonville in constructing its test, i. e., ascertainment of the minimum skill, ability and knowledge necessary for the position of fire fighter.[12] It is of no small significance that the content validity study was conducted in strict conformance with the guidelines developed by the EEOC and set forth in the Code of Federal Regulations. In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Supreme Court, citing *Griggs*, held that these guidelines are "entitled to great deference." *Id.* at 430–31, 95 S.Ct. at 2377–2388.

The EEOC guidelines were established in accordance with accepted professional standards such as the Standards for Educational and Psychological Tests prepared by a joint committee of the American Psychological Association, the American Educational Research Association, and the National Council on Measurement in Education. 29 C.F.R. § 1607.5(C).

■ Plaintiffs have established a prima facie case of racial employment discrimination by showing that the Fire Fighters Selection Examination results in a disproportionate hiring of whites. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). This prima facie case has been rebutted by showing that the test has been validated. Therefore, the plaintiffs cannot prevail under the Title VII standard. Neither can they prevail under the constitutional standard, as they have not alleged, nor has the Court found, any evidence of purposeful discrimination. Once the test has been demonstrated to be job related, plaintiffs could prevail only if they showed the tests are merely a "pretext" and that other adequate selection devices could be utilized to serve the employer's interest in "efficient and trustworthy workmanship." *Albemarle Paper Co. v. Moody, supra*, at 425, 95 S.Ct. at 2375, citing *McDonnell Douglas Corp. v. Green, supra*, at 801, 93 S.Ct. at 1823. No such showing has been made.

■ The defendants should not misinterpret the Court's decision upholding the constitutionality of the exam and the cutoff score as a "seal of approval" affixed to their hiring practices relating to the position of fire fighter. To the contrary, the Court is disappointed that, almost ten years subsequent to its entry of the consent order, the ratio of black to white firemen is still not equivalent to the ratio of black to white citizens in the City of Jacksonville. It is true that Jacksonville citizens have a right to expect competent, qualified fire fighters able to adequately defend their lives and property. Nevertheless, it is also true that citizens have an interest in assuring that

---

*v. Davis*, 426 U.S. 229, 238 n. 10, 96 S.Ct. 2040, 2047 n. 10, 48 L.Ed.2d 597 (1976).

12. The cutoff score is valid because it was set in reference to the determination of the number of questions that assess the minimum knowledge, skills and abilities necessary for the job.

If the cutoff score was set arbitrarily, of course, it would not withstand constitutional scrutiny. *Walston v. County School Board of Nansemond City, Virginia*, 492 F.2d 919, 925 (4th Cir. 1974).

their race is adequately represented among those fire fighters.

The defendants are advised that they remain bound by the 1971 order which requires them:

(1) to conduct pretest training and/or counseling on the employment methods utilized so as to familiarize candidates for the position of Fire Private with the form, content and general nature of the testing devices used.

(2) to intensify recruitment efforts in order to attract "qualified and interested" black applicants through the use of appropriate media communications and visits to the black community by black recruiters.

(3) to conduct examinations at two or more locations in the City of Jacksonville for the convenience of all applicants, black as well as white, with at least one examination location in the predominantly black sections of Jacksonville.

Of course, the defendants also remain bound by paragraph 7 of the August 12, 1971, order, as modified by order of September 29, 1971, establishing the "50–50" hiring formula.

*Corley v. City of Jacksonville—*

█ The decision of the Court to uphold the validity of the Fire Fighter Selection Examination as well as the cutoff score of 70 leads to the conclusion that the motion for preliminary injunction filed in this case must be denied. The plaintiffs have not demonstrated a likelihood of prevailing on the merits, even assuming they have satisfied the other requirements of the preliminary injunction test. Such a showing, of course, is a necessary ingredient in demonstrating a plaintiff's entitlement to the issuance of a preliminary injunction. *Allison v. Froehlke*, 470 F.2d 1123, 1126 (5th Cir. 1972).

The two named plaintiffs were not hired as fire fighters in a permanent capacity for the sole reason that they failed the written

examination.[13] Therefore, the above determination in regard to the constitutional and statutory validity of that exam renders it unlikely that they will prevail on the merits.

## ORDER

In accordance with the opinion entered by the Court this date in the above-styled cause, it is

ORDERED:

1. The defendants are not in contempt of the August 12, 1971, consent order, as modified by stipulation on September 29, 1971.

2. The motion for preliminary injunction filed by the plaintiffs in *Corley v. City of Jacksonville*, No. 80–383–Civ–J–S, is hereby denied.

**13.** Although the plaintiff John Corley was initially denied state certification due to a medical condition, certification was subsequently granted. See note 9, *supra*.